UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
F I L E D
SEP 1 6 2021
Nathan Ochsner
Clerk of Court

| | |
|---|---|
| UNITED STATES OF AMERICA, § | |
| § | Criminal No. |
| v. § | **4:21cr458** |
| § | UNDER SEAL |
| AKINTUNDE OYEWALE § | |

# INDICTMENT

The Grand Jury charges:

## General Allegations

At all times material to this Indictment, unless otherwise specified:

1. **Medicare.** The Medicare Program ("Medicare") was a federal health care program providing benefits to individuals who were over the age of 65 or disabled. Individuals receiving benefits under Medicare were referred to as Medicare "beneficiaries."

2. Medicare was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

3. Health care providers that provided services to Medicare beneficiaries were required to apply for and obtain a "provider number". Part of this application process required that the health care providers certify that they understand and will abide by the federal laws and regulations governing their participation in Medicare, including a specific understanding of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7(b).

4. A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries. A Medicare claim was required to set forth, among other things, the beneficiary's name and Medicare information number, the services that were performed for the beneficiary, the date the

services were provided, the cost of the services, and the name and identification number of the physician or other health care provider that ordered the services.

5. Part A of the Medicare program covered eligible home health services provided by a participating home health agency ("HHA") provided to Medicare beneficiaries who were confined to their homes and had a medical need for skilled nursing care, physical therapy, speech therapy, or an ongoing need for occupational therapy. Claims for qualifying home health services were typically reimbursed in full to the HHA based on contract rates determined by Medicare.

6. Upon enrollment, Medicare providers were issued a provider manual that describes the requirements to participate as a provider in the Medicare program. Providers also periodically receive newsletters advising them of the additional requirements for participation and instructions on what services are or are not covered by Medicare.

7. Since October 2000, Medicare compensation to home health care agencies have been based on the Prospective Payment System (PPS). Under this system, Medicare paid a home health care agency a base payment, which is adjusted based on the severity of the beneficiary's health condition and care needs. The PPS payment provided home health care agencies with payments for each 60-day episode of care for each beneficiary. If the beneficiary was still eligible for home health care after a home health episode, they may be recertified for another 60-day home health episode. There was no limit to the number of home health episodes that a beneficiary may receive, so long as the beneficiary was still eligible for home health services.

8. CMS did not directly pay Medicare Part A claims submitted by Medicare certified HHAs. CMS contracted with different companies to administer the Medicare Part A

program throughout different parts of the United States. In the State of Texas, CMS contracted with Medicare Administrative Contractors ("MACs") to administer Part A HHA claims. As administrator, MACs received, adjudicated, and paid claims submitted by HHA providers under the Part A program for home health services.

9. According to 42 Code of Federal Regulations (CFR) section 409.42, for home health services to be covered and therefore compensable by Medicare, all of the following eligibility requirements must be met:

    a. The beneficiary must be confined to the home or an institution that is not a hospital (i.e., homebound).
    b. The beneficiary must be under the care of a physician who specifically determined there was a need for home health care and established the Plan of Care
    c. The beneficiary must be in need of skilled services such as intermittent skilled nursing services, physical therapy, speech-language pathology services, or continuing occupational therapy services.
        i. More specifically, in section 409.44, where a service can be safely and effectively performed (or self-administered) by non-licensed staff without the direct supervision of a nurse, the service cannot be regarded as a skilled service even if a nurse actually provides the service.
    d. The beneficiary must be under a plan of care that meets the requirements specified in section 409.43.
    e. The home health services must be provided by, or under arrangements made by, a participating home health care agency.

10. **Homebound Status**: In order for a patient to be eligible to receive covered home health services under both Medicare Part A and Part B, the law required that a physician certify that the patient was confined to the home. The condition of the patients should be such that there existed a normal inability to leave home and, consequently, leaving home required a considerable and taxing effort. If a patient did in fact leave the home, the patient may nevertheless be considered homebound if the absences from the home were infrequent, or for periods of relatively short duration, or were attributable to the need to receive health care treatment.

3

11. **OASIS and Plan of Care**: To determine the proper level of care for a beneficiary and ultimately to help determine the amount of payment the provider will receive, Medicare required that home health care agencies perform a patient-specific, comprehensive assessment that accurately reflected the patient's current health and provided information to measure his progress. In making this assessment, home health care agencies were required to use a tool called the Outcome and Assessment Information Set (OASIS).

12. With limited exceptions, the OASIS assessment must have been completed by a Registered Nurse (RN). The standard OASIS form was a detailed checklist that the nurse examining the prospective patient completed. The form was detailed and comprehensive, covering: clinical record items identifying the agency, the patient, the referring physician, and the period of care; demographics and patient history; living arrangements, including an evaluation of safety and sanitary conditions of the home; supportive assistance from co-habitants, relatives, and other care-givers; separate assessments of every area of the body, external and internal; mental and psychological status; functional limitations; activities of daily living such as bathing, grooming, shopping, reading and writing; permitted activities; medications and allergies; medical appliances and equipment; and therapy, teaching, training, and skilled care needs. The OASIS also contained spaces for a written analysis of findings; a projection of the number and type of treatments needed; and a description of goals, rehabilitation potential, and discharge plans for the beneficiary.

13. The OASIS information was then used to create a Plan of Care ("Form 485"). The Plan of Care specified the frequency of home visits and described the services to be provided to the beneficiary. The beneficiary's physician must sign the Form 485, certifying that the patient is confined to the home and needs intermittent skilled care. Further, the

physician certified that the physician is caring for the beneficiary and that the services set forth on the plan of care are authorized by the physician.

14. **Provision of Home Health Services**: Following the initial assessment, and based upon either completion of the Form 485 or a verbal order from the doctor (later confirmed by a signed Form 485), nurses, physical therapists, and/or other home health professionals visited the patient based on the frequency ordered by the doctor and recorded the visit in progress notes.

15. **Documentation**: Medicare Part A regulations required HHAs providing services to Medicare patients to maintain complete and accurate medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for reimbursement were submitted by the home health agency. When they filled out Medicare enrollment applications, providers must identify all locations where patient records will be kept. Among the written records required to be maintained are:

    a. the Plan of Care, which includes the physician order for home health care, diagnoses, types of services/frequency of visits, prognosis/rehabilitation potential, functional limitations/activities permitted, medications/treatments/nutritional requirements, safety measures/discharge plans, goals, and physician signature;

    b. the OASIS start-of-care form;

    c. a signed certification statement by an attending physician certifying that the patient is under the physician's care, is confined to his or her home, and needs the planned home health services; and

    d. medical records of each visit made by a nurse, therapist, or home health aide to a beneficiary, describing, among other things, any significant observed signs or symptoms, any treatment and drugs administered, any reactions by the patient, any teaching and the understanding of the patient, and any changes in the patient's physical or emotional condition.

16. These medical records were required to be sufficient to permit Medicare, through its contractors, to review the appropriateness of Medicare payments made to the HHA under the Part A program.

## RELEVANT INDIVIDUALS AND ENTITIES

17. Grace Healthcare Services Inc. ("Grace") was a Texas corporation doing business 11311 Harwin Dr., Houston, Texas within the Southern District of Texas. Grace purportedly provided home health services to Medicare beneficiaries from in or around 2014 through in or around 2017.

18. **AKINTUNDE OYEWALE**, a resident of Fort Bend County, Texas. **OYEWALE** co-owned, administered, and operated Grace from at least January 2014 through September 2017.

19. P.O., was a patient recruiter for home health agencies, including Grace.

20. T.B., employee of Clinic A, and owner of Clinic E, collected payment from Grace and other home health companies to provide fraudulent home health certifications.

21. S.B., employee of Clinic M, collected payment from Grace and other home health companies to provide fraudulent home health certifications.

## COUNT 1

### Conspiracy to Commit Health Care Fraud
### (Violation of 18 U.S.C. § 1349)

22. Paragraphs 1 through 21 are realleged and incorporated by reference as if fully set forth herein.

23. From in or around January 2014 to in or around September 2017, the exact dates being unknown to the Grand Jury, in the Houston Division of the Southern District of Texas,

and elsewhere, Defendant **AKINTUNDE OYEWALE** did knowingly and willfully combine, conspire, confederate, and agree with P.O, T.B., S.B., and with others known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1347, that is, to knowingly and willfully execute and attempt to execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by and under the custody and control of Medicare, a health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services.

### Purpose of the Conspiracy

24.     It was a purpose of the conspiracy for Defendant **AKINTUNDE OYEWALE**, and others known and unknown to the Grand Jury, to unlawfully enrich themselves by (a) submitting and causing the submission of false and fraudulent Part A claims to Medicare for home health services, and (b) diverting and causing the diversion of the proceeds of the fraud for the personal use and benefit of the Defendants and their co-conspirators.

### Manner and Means of the Conspiracy

The manner and means by which the Defendant **AKINTUNDE OYEWALE** and co-conspirators sought to accomplish the purposes and objects of the conspiracy included, among other things, the following:

25.     Defendant **AKINTUNDE OYEWALE** maintained a Medicare provider number for Grace that the Defendants and their co-conspirators used to submit and cause to be submitted claims to Medicare for home health services that were not medically necessary, not provided, or both.

26. Defendant **AKINTUNDE OYEWALE** unlawfully paid and caused the payment of money, or kickbacks, to P.O. in exchange for referring Medicare beneficiaries to Grace for home health services.

27. Defendant **AKINTUNDE OYEWALE** unlawfully paid and caused the payment of kickbacks to Clinic A and other certifying physicians' clinics. In turn, physicians working at Clinic A and Clinic M unlawfully certified a number of Grace's patients for home health services without meeting or examining the patients, as required by Medicare. The physicians authorized medically unnecessary home health services for Medicare beneficiaries. **AKINTUNDE OYEWALE** utilized the unlawful home health certifications in his scheme to cause Grace to bill Medicare for medically unnecessary home health claims.

28. **AKINTUNDE OYEWALE** failed to produce supporting documentation for billed home health claims, such as patient medical records.

29. From in or around January 2014 to in or around September 2017, **AKINTUNDE OYEWALE**, and co-conspirators, known and unknown to the Grand Jury, submitted or caused the submission of claims to Medicare for home health services that were not medically necessary, not provided, or both. Medicare paid approximately $1.4 million on those claims. **AKINTUNDE OYEWALE** transferred those Medicare funds for his and his family members use and benefit.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS 2-6

### Health Care Fraud
### (Violation of 18 U.S.C. §§ 1347 and 2)

30.     Paragraphs 1 through 29 are re-alleged and incorporated by reference as if fully set forth herein.

31.     On or about the dates specified below, in the Houston Division of the Southern District of Texas and elsewhere, Defendant **AKINTUNDE OYEWALE** aided and abetted by, and aiding and abetting, others known and unknown to the Grand Jury, did knowingly and willfully execute and attempt to execute, a continuing scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain by means of continuously materially false and fraudulent pretenses, representations, and promises, money and property owned by and under the custody and control of Medicare, a health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, as set forth below:

| Count | Medicare Beneficiary | Approx. Dates of Service and Billings | Description of Services Billed | Approx. Billing to Medicare By Grace |
|---|---|---|---|---|
| 2 | C.F. | 4/23/16 to 9/16/16 | Home Health | $2,382 |
| 3 | D.M. | 7/4/14 to 12/29/16 | Home Health | $1,350 |
| 4 | W.A. | 4/23/16 to 9/16/16 | Home Health | $2382 |
| 5 | B.E. | 4/23/16 to 9/16/16 | Home Health | $2382 |
| 6 | O.B. | 4/23/16 to 9/16/16 | Home Health | $2382 |

All in violation of Title 18, United States Code, Sections 1347 and 2.

9

# COUNT 7-11
## Aggravated Identity Theft
## (18 U.S.C. § 1028A)

32. Paragraphs 1 through 31 of this Indictment are realleged and incorporated by reference as if fully set forth herein.

33. From in and around April 2016 through in and around December 2016, the exact dates being unknown, in the Houston Division of the Southern District of Texas, and elsewhere, the Defendant **AKINTUNDE OYEWALE** during and in relation to a felony violation of Title 18, United States Code, Section 1347, Health Care Fraud, aiding and abetting one another, did knowingly transfer, possess, or use, without lawful authority, a means of identification of another person, including but not limited to the following:

| Count | Medicare Beneficiary Initials | Approx. Dates identifying information transferred/ possessed/ used | Identity theft victim's Medicare Number (last 5 digits listed) | Means by which identity was used without lawful authority |
|---|---|---|---|---|
| 7 | C.F. | 4/23/16 to 9/16/16 | 0962A | Transferred, possessed, and used victim's identifying information and Medicare Identification Number to fraudulently bill Medicare. |
| 8 | D.M. | 7/4/14 to 12/29/16 | 282C4 | |
| 9 | W.A. | 4/23/16 to 9/16/16 | 9307A | |
| 10 | B.E. | 4/23/16 to 9/16/16 | 5334A | |
| 11 | O.B. | 4/23/16 to 9/16/16 | 7908A | |

All in violation of Title 18, United States Code, Section 1028A.

## NOTICE OF CRIMINAL FORFEITURE
### (18 U.S.C. § 982(a)(7))

34. Pursuant to Title 18, United States Code, Section 982(a)(7), the United States of America gives notice to Defendant **AKINTUNDE OYEWALE** that upon conviction of any of Counts One through Six in this Indictment, all property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of such offenses is subject to forfeiture.

35. The United States will seek the imposition of a money judgment against the defendant. In the event that a condition listed in 21 U.S.C § 853(p) exists, the United States will seek to forfeit any other property of the defendant in substitution up to the amount of the money judgment.

A TRUE BILL:
ORIGINAL SIGNATURE ON FILE
FOREPERSON OF THE GRAND JURY

Jennifer B. Lowery
ACTING UNITED STATES ATTORNEY

Abdul Farukhi
Special Assistant United States Attorney
U.S. Attorney's Office
Southern District of Texas

11